# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

PATSY A. HULL-KITCHEN,                    :

      Plaintiff,                         :

                                     Case No. 3:11cv00423

vs.                                      :

                                     District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                        :    Chief Magistrate Judge Sharon L. Ovington
Commissioner of the Social
Security Administration,                  :

      Defendant.                         :

---

# REPORT AND RECOMMENDATIONS[1]

---

## I.    INTRODUCTION

Plaintiff Patsy A. Hull-Kitchen applied for Disability Insurance Benefits with the Social Security Administration in October 2006.  She asserted throughout her administrative proceedings that she was eligible to receive benefits because she is under a "disability" within the meaning of the Social Security Act.  Her disability began, she alleged, on January 9, 2005 due to mental health problems, irritable bowel syndrome, and hypertension.

The Social Security Administration denied Plaintiff's application for benefits mainly through the non-disability decision of Administrative Law Judge (ALJ) Amelia G. Lombardo.  (Doc. # 10, PageID at 55-68).  The ALJ's nondisability decision and resulting

---

[1]  Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

denial of benefits became the final decision of the Social Security Administration.  Such final decisions are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff is now due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #17), the Commissioner's Memorandum in Opposition (Doc. #21), Plaintiff's Reply (Doc. # 22), the administrative record (Doc. # 10), and the record as a whole.

Plaintiff contends that a reversal of the ALJ's decision is warranted and, at minimum, a remand is needed to correct certain errors in the ALJ's decision.  The Commissioner seeks an Order affirming the ALJ's decision as supported by substantial evidence.

## II.    BACKGROUND

### A.    Plaintiff's Vocational Profile and Testimony

Plaintiff was 55 years old on her alleged onset date of disability and is thus considered to be a "person of advanced age" for the purpose of resolving her eligibility for Disability Insurance Benefits.  *See* 20 C.F.R. §404.1563(e).  She has a high school education and has worked as an administrative assistant, customer complaint clerk, and general office clerk.

During the ALJ's hearing, Plaintiff and a vocational expert testified.  Plaintiff was represented by counsel.

When asked about her mental impairments, Plaintiff testified that she had a

breakdown.  At the time, she experienced nightmares – "re-dreaming when [her] dad was killed...."  She noted, "I had to clean up where he – somebody killed him."  She began having nightmares in or near April 2005 (about four years before the ALJ's hearing). (Doc. #10, PageID at 83-84).

Plaintiff began mental-health treatment at Advanced Therapeutics in the summer of 2006 "because that's when [she] knew something was wrong."  She couldn't remember anything and thought she had Alzheimer's.  At Advanced Therapeutics, she first saw Amparo Wee, M.D.  When Dr. Wee retired, Plaintiff began seeing Justiniano-Toro, M.D., who was also at Advanced Therapeutics.  She initially saw Dr. Justiniano-Toro every week, until she lost her health insurance.  At the time of the ALJ's hearing, Plaintiff saw Dr. Justiniano-Toro monthly (45 minutes to an hour per appointment), and he was also available to help her if she had "a bad time where [she] might want to end everything ...." Plaintiff also saw therapist Laurie Griffin "every week for months."  (Doc. #10, PageID at 84-85).

Plaintiff testified about hearing dead people talk.  She stated, "if I go to sleep, they wake me up.  My dad's coming back.  My brother's coming back....  And they're in the house."  (Doc. #10, PageID at 90-91).  When Plaintiff's attorney asked her to talk about her view of life, she explained:

> It's ugly.  And I loved life.  I loved living with my son, raising him, and my husband.  And now I don't even want to walk out and see the sunshine.  It's – nothing matters.  I – I'm tired of what I'm putting everything – everybody else through [sic].  My dad did it to me, and I don't want to do it to anybody else.

3

*Id.*, PageID at 91.

Plaintiff also acknowledged having panic attacks because she knows she is supposed to do something, but she forgets.  She does not sleep well at night and needs to take a nap during the day.  She naps for an hour or sometimes up to three hours during the day.  Between naps she is "so tired....  And it's horrible how the diarrhea drains your energy....  [T]hat's why I need my water.  I need my water.  (Doc. #10, PageID at 91-92).

Plaintiff also testified about her bowel problem.  She explained that she never knows when it will be at its worst, which is why she does not leave her house.  She added, "I don't go anywhere."  She acknowledged that she had worked for many years with this problem and that she also worked with a ruptured gall bladder.  Plaintiff further testified that she has "osteo" (presumably, osteoarthritis) in her leg around her knee, causing her pain and preventing her from standing for a long period of time.  (Doc. #10, PageID at 82, 85).

Plaintiff estimated that she could walk 15 yards at one time due to her leg, hip, feet problems and shortness of breath.  She cannot stand for any period of time because of her feet problems.  When asked about her ability to sit, Plaintiff answered:  "... I can't sit totally because the medicine doesn't keep that whole area from burning.  I mean it's raw." She can sit for one-half hour before she needs to go to the bathroom.  (Doc. #10, PageID at 86).

Plaintiff testified that she has a hard time moving her arm.  She had a birth defect that causes her to be part right-handed and part left-handed.  She further noted, "My –

4

they didn't know my arm was broken. So – and I could type 120 words a minute, and I – and now I'm lucky if I could find the keys to – and remember my password." She can lift one-half gallon of milk but not one gallon of milk. (Doc. #10, PageID at 86-87).

Plaintiff explained that her husband and son performed the housework, and her son does all the outside work. She goes grocery shopping with her husband once in a while. Her husband does the cooking and laundry. Sometimes she will remain in her house for a whole week without leaving. When she does leave, it is only for doctor appointments. (Doc. #10, PageID at 87-88).

### B.    Medical Opinions

The parties' reviews of the medical records and other information in the administrative record not be repeated in full here. (Doc. #17, PageID at 531-36; Doc. #21, PageID at 555-58). Yet some highlights from the medical opinions of record are worth mentioning.

### Amparo Wee, M.D.

On April 16, 2007, Dr. Wee, a psychiatrist at Advanced Therapeutics, completed a mental health assessment of ability to do work related activities on behalf of Plaintiff's long-term disability carrier. Dr. Wee reported that she had treated Plaintiff since September 2006 and had seen her on a monthly basis since. She continued to cry for no reason and experience nightmares of a traumatic childhood event. He believed that she was not stable mentally and needed intensive (weekly) individual therapy. Dr. Wee listed Plaintiff's diagnoses as post traumatic stress disorder, major depressive disorder

(recurrent), and histrionic personality disorder.  He assigned Plaintiff a Global

Assessment of Functioning (GAF) score of 40.[2]  A GAF of 31-40 refers to a person with

"[s]ome impairment in reality testing, or impairment in speech and communication, or

serious impairment in several of the following: occupational or school functioning,

interpersonal relationships, judgment, thinking, or mood."  Dr. Wee opined that Plaintiff

had poor or no ability to deal with work stresses or maintain attention and concentration,

to behave in an emotionally stable manner or relate predictably in social situations.  Dr.

Wee concluded that Plaintiff was "Not currently employable."  (Doc. #10, PageId at 304-

06).

### Luis Justiniano-Toro, M.D.

Luis Justiniano-Toro, M.D., another psychiatrist at Advanced Therapeutics, began

to treat Plaintiff after Dr. Wee retired.  On September 29, 2008, Dr. Justiniano-Toro

completed a mental health assessment of ability to do work related activities on behalf of

Plaintiff's long-term disability carrier.  Dr. Justiniano-Toro listed Plaintiff's diagnoses as

bipolar disorder and personality disorder (not otherwise specified).  He assigned Plaintiff

a GAF score of 35.  Dr. Justiniano-Toro opined that Plaintiff had poor or no ability to

make occupational adjustments in the work place, such as deal with work stresses or

maintain attention/concentration, perform simple and repetitive tasks, behave in an

---

[2]  Global Assessment Functioning is used by health-care professionals to assess a person's
psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is,
in general, a snapshot of a person's "overall psychological functioning" at or near the time of the
evaluation.  *See Martin v. Commissioner*, 61 Fed.Appx. 191, 194 n.2 (6th Cir. 2003); *see also* Diagnostic
and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 32-34.

emotionally stable manner, relate predictably in social situations or demonstrate reliability.  Dr. Justiniano-Toro concluded that Plaintiff "can not work." (Doc. #10, PageId at 347-49).

In March 2010, Dr. Justiniano-Toro completed another form assessing Plaintiff's mental abilities to perform work activities.  He diagnosed Plaintiff with bipolar disorder, personality disorder NOS (not otherwise specified), and he again assessed her GAF at 35. Dr. Justiniano-Toro continued to opine that Plaintiff had poor or no ability to perform the mental demands of work.  (Doc. #10, PageId at 498-500).

### Jerry Flexman, Ph.D.

Dr. Wee referred Plaintiff to Jerry Flexman, Ph.D. in November 2006 for a neuropsychological evaluation.  Dr. Flexman observed that Plaintiff's body movements were restless, her speech revealed some mild "press," her eye contact was fair 70% of the time, and her affect was dramatic and expansive.  It appears that Plaintiff did not complete the evaluation.  At the end of his report, Dr. Flexman concluded, "The information that we were able to obtain did show some variability in her performance most of which appears to be due to psychological distress as opposed to an organic impairment....  Marked psychological distress including anxiety, depression, and some unusual thought processes are seen."  (Doc. #10, PageId at 275-78).

Dr. Flexman evaluated Plaintiff again in March 2007 on behalf of the Ohio Bureau of Disability Determinations.  Dr. Flexman noted that Plaintiff's effort during the mental status examination was poor and her response style suboptimal, as she was "unmotivated

during the evaluation." Dr. Flexman found that Plaintiff's behavior "suggested moderate malingering." He reported that Plaintiff's "[o]bsessive thinking concerning somatic or other psychological problems was judged to be out of proportion with reality." Dr. Flexman diagnosed posttraumatic stress disorder, chronic; major depression, recurrent; and an undifferentiated somatoform disorder. He assigned Plaintiff a GAF score of 60, referring to "moderate symptoms ... or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision at 34; *see* Doc. #10, PageId at 280–83.

Dr. Flexman opined, in part, that Plaintiff had slight difficulties with short, simple instructions, simple work-related decisions, and sustaining attention; slight difficulties in making judgments for simple work-related activities; slight difficulties in maintaining sustained attention; moderate restrictions interacting with supervisors, coworkers, and the public; and moderate restrictions in responding appropriately to work pressures and changes in a normal work setting. He again assessed Plaintiff's GAF at 60. (Doc. #10, PageId at 280-83).

### Tonnie Hoyle, Psy.D.

Dr. Hoyle reviewed the record for the Ohio Bureau of Disability Determinations in March 2007. Dr. Hoyle diagnosed Plaintiff with chronic post traumatic stress disorder and personality disorder, and assessed her GAF at 60. Dr. Hoyle believed that Plaintiff had mild restrictions in her activities of daily living and moderate difficulties in

8

maintaining social functioning and in maintaining concentration, persistence or pace. Dr. Hoyle concluded that Plaintiff retained the capacity for "simple to moderately complex work that does not involve more than occasional interactions with supervisors and coworkers. She would do best in an environment that does not have fast paced production quotas." (Doc. #10, PageId at 284-301).

### C. Vocational Expert Testimony

The ALJ's assessment of Plaintiff's residual functional capacity,[3] which she incorporated in her hypothetical questions to the vocational expert, assumed an individual with the ability to do medium work, limited by the need to change positions between sitting and standing at 45 minute intervals, and limited to unskilled work that is low stress (i.e., no assembly-line production quotas). The vocational expert responded that such a person could perform the jobs as a crate liner, hand packager, and machine packager. Four thousand such jobs exist in the regional economy, which is representative of the national economy, according to the vocational expert. (Doc. #10, PageID at 93-96).

## III. ADMINISTRATIVE REVIEW

### A. "Disability" Defined

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v.*

---

[3] A claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations. 20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

*City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term

"disability" – as defined by the Social Security Act – has specialized meaning of limited

scope.  It encompasses those who suffer from a medically determinable physical or

mental impairment severe enough to prevent them from engaging in substantial gainful

activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  An

applicant for Disability Insurance Benefits bears the ultimate burden of establishing that

he or she is under a "disability."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see*

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also*

*Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a

five-Step sequential evaluation of the evidence.  *See* 20 C.F.R. § 404.1520(a)(4).

Although a dispositive finding at any Step terminates the ALJ's review, *see Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete sequential evaluation answers

five questions:

1.   Has the claimant engaged in substantial gainful activity?

2.   Does the claimant suffer from one or more severe impairments?

3.   Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.   Considering the claimant's residual functional capacity, can she perform her past relevant work?

5.   Considering the claimant's age, education, past work experience, and residual functional capacity, can he or she perform other work available

10

in the national economy?

20 C.F.R. § 404.1520(a)(4); *see Ealy v. Comm'r of Social Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).

> **B.  ALJ Lombardo's Decision**

ALJ Lombardo's pertinent findings began at Step 2 of the sequential evaluation where she concluded that Plaintiff has the severe impairments of osteoarthritis of the right knee with residuals of arthroscopic surgery, mild obesity, anxiety, and depression.

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings.

At Step 4, the ALJ found that Plaintiff retained the Residual Functional Capacity to perform medium work[4] except that Plaintiff requires the ability to change positions between sitting and standing at 45 minute intervals.  Furthermore, Plaintiff is restricted to performing unskilled work that is low stress, i.e., involves no assembly-line production quotas.  The ALJ concluded at Step 4 that Plaintiff was unable to perform any of her past relevant work.

At Step 5, the ALJ used section 203.15 of the Grid[5] as a framework for analysis. The ALJ considered the vocational expert's testimony; Plaintiff's age, education, work experience; and her residual functional capacity.  The ALJ then concluded that there are

---

[4]  The Regulations define medium work as involving the ability to lift "no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds...." 20 C.F.R. §404.1567(c).

[5]  *See* Medical-Vocational Guidelines, 20 C.F.R. Subpart P, Appendix 2.

significant number of jobs available in the national economy that Plaintiff can perform.

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and, therefore, not eligible for Disability Insurance Benefits.  (Doc. #10, PageId at 57-68).

## IV.  JUDICIAL REVIEW

Judicial review of an ALJ's decision proceeds along two lines: " whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r. of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings.  *Rogers v. Comm'r. of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r. of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999).  Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'"  *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Social Security*, 375 F.3d 387, 390 (6th Cir. 2004).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..."  *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal

criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings.  *Rabbers v. Comm'r. of Social Security*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746.  "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746 and citing *Wilson v. Comm'r. of Social Security*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V.     DISCUSSION

### A.     <u>Plaintiff's First Issue</u>

Plaintiff frames her first issue as follows:

Whether the administrative law judge's decision at Step 5 of the sequential evaluation is supported by substantial evidence where vocational expert testimony conflicts with Social Security's own rules and regulations?

(Doc. #17, PageID at 529)(bold removed).  Plaintiff answers "No," finding such a conflict between the definition of "medium" work and the vocational expert's testimony.

The ALJ found that Plaintiff's ability to perform medium work was limited, in part, by her need to change position between sitting and standing every 45 minutes.  The vocational expert testified that a person with the ability to perform medium work with this limitation could perform work as a crate liner, hand packager, or machine packager.

Plaintiff correctly points out that the Regulations define "medium work" to require

13

lifting up to 50 pounds occasionally and 25 pounds frequently.  *See* 20 C.F.R.

§404.1567(c).  Plaintiff also accurately quotes a Social Security Ruling that describes

medium work, in part, as follows:

> A full range of medium work requires standing or walking, off an on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequently lifting or carrying objects weighing up to 25 pounds ... In most medium jobs, being on one's feet for most of the workday is critical.  Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time.

(Doc. #17, PageID at 537-38)(quoting Soc. Sec. Ruling 83-10, 1983 WL 31251 at *6).

Plaintiff contends, "The administrative law judge's findings allows, at best,

walking and standing 50 percent of the time (45-minute intervals)."  Given this limitation,

Plaintiff reasons, she lacks the ability to perform medium work – and the jobs identified

by the vocational expert – because she cannot be on her feet for up to six hours in an

eight-hour workday.

Plaintiff's contentions lack merit.  She overlooks that the ALJ's questions asked

the vocational expert to consider a person with the ability to perform less than the full

range of medium work – i.e., a person who could perform medium work but was limited

by her need to change positions every 45 minutes.  This proper hypothetical question did

not conflict with the Regulations or Ruling 83-10 because it included the ALJ's

assessment of Plaintiff's residual functional capacity at the medium-work level with this

sit/stand limitation.  This limitation effectively created the need for vocational-expert

testimony to explain what jobs a hypothetical person could perform at the medium-work

14

level yet limited by a need to alternatively sit then stand for 45 minutes each.  *See Heston
v. Commissioner of Social Sec.*, 245 F.3d 528, 537 (6th Cir. 2001) ("when a claimant's
abilities fall between the regulatory guidelines for exertional limitations ... 'vocational
specialist assistance is advisable' ...." (quoting, in part, Soc. Sec. Ruling 83-12, 1983 WL
31253); *cf.* Social Security Ruling 96-9p, 1996 WL 374185 at *7 (considering sedentary
work limited by alternate sitting and standing:  "It may be especially useful in these
situations to consult a vocational resource in order to determine whether the individual is
able to make an adjustment to other work.").  The vocational expert, moreover, explained
that the jobs she identified were "jobs where an individual could change positions as
needed."  (Doc. #10, PageID at 96).

Plaintiff, moreover, has not shown that her need to alternate between sitting and
standing at 45 minute intervals is inconsistent with medium work.  This sit/stand
limitation, in the present case, might – but does not necessarily – equate to 50 percent
standing and 50 percent sitting during a workday.  A person may change her position
every 45 minutes and still stand or walk as much as six hours in an eight-hour workday
since she does not necessarily need to remain in the same (sitting or standing) position for
a full 45 minutes.

Plaintiff emphasizes that her ability to perform medium work is critical given that
the "Grids" would direct a finding of disabled even if she could perform the full range of
light work.  *See* Rule 202.06, Medical Vocational Guidelines, 20 C.F.R. Part 404, Subpt.
P, Appx. 2.  The Grids, however, are neither directly applicable nor dispositive in this

case because Plaintiff's residual functional capacity falls between light work and the full

range of medium work and because she has both exertional and nonexertional

impairments.  *See* 20 C.F.R. § 404.1569a (providing examples of exertional and

nonexertional impairments).  In this situation, the Grids are used only as a guide or a

framework for disability determination.  *See Bohr v. Bowen*, 849 F.2d 219, 221 (6th Cir.

1988); *see also* §§ 200.00(d)-(e), Medical Vocational Guidelines, 20 C.F.R. Part 404,

Subpt. P, Appx. 2; Soc. Sec. Ruling 83-11 (use of Grid Rules appropriate where a

claimant's residual functional capacity "coincides with the ... strength requirements of

sedentary, light, or medium work <u>and includes no nonexertional limitations</u>.")(emphasis

added).

Accordingly, Plaintiff has not shown that the ALJ erred by relying on the

vocational expert's testimony, and the vocational expert's testimony constitutes

substantial evidence in support of the ALJ's conclusions at Step 5 of her sequential

evaluation.

### B.    <u>Plaintiff's Second Issue</u>

Plaintiff frames her second issue as follows:

Whether the administrative law judge's finding of residual functional
capacity is supported by substantial evidence where even the State agency
found greater restriction on Ms. Hull-Kitchen's ability to perform the
mental demands of work and the administrative law judge provided no
rationale for rejecting these limitations and her evaluation of other opinion
evidence was also flawed?

(Doc. #17, PageID at 529).  Plaintiff answers, "No," finding errors in the ALJ's partial

reliance on Dr. Flexman without an explanation of why she ignored Dr. Flexman's and Dr. Hoyle's opinions that Plaintiff could do no more than occasional interactions with the public, co-workers and supervisors.  Plaintiff further argues that the ALJ erred by ignoring Dr. Hoyle's opinion that Plaintiff could not meet fast-paced-production demands and Dr. Flexman's opinion finding moderate limitations in Plaintiff's ability to handle "normal" work stress.  And Plaintiff maintains that the ALJ erred by not crediting certain greater limitations identified by her treating mental-health-medical sources, Dr. Wee and Dr. Justiniano-Toro.

The Commissioner contends that the ALJ reasonably weighed each medical-source opinion concerning Plaintiff's mental impairments and provided good reasons for the weight given each opinion.

The treating physician rule, when applicable, requires the ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor or a one-time examining physician or psychologist or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406 (6th Cir. 2009); *see Wilson*, 378 F.3d at 544 (6th Cir. 2004).  A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and if it is not inconsistent with other substantial evidence of record.  *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination,

17

the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id*. at *2-*3. The Regulations explain, "In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in §404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(f); *see also* Ruling 96-6p at *2-*3.

The ALJ rejected the opinions provided by Dr. Justiniano-Toro and Dr. Wee as not "supported by the weight of the evidentiary record, including the evaluation of Dr. Flexman and the treatment records of Dr. Justiniano-Toro at Advanced Therapeutics." (Doc. #10, PageID at 65). In doing so, the ALJ compared the opinions of treating sources Drs. Justiniano-Toro and Wee with the evidence of record as required under the treating-physician rule and the factors of supportability and consistency. In addition, a review of the opinions provided by  Dr. Justiniano-Toro reveals no meaningful supporting

explanation; instead, Dr. Justiniano-Toro refers to Plaintiff's diagnoses and does not identify the signs and symptoms from which Plaintiff's suffers to support an analysis of her work abilities. *See* Doc. #10, PageID at 347-49, 498-500. Although Dr. Wee identified several symptoms in support of her opinions, Dr. Wee provided no meaningful explanation in support of her opinions. *See id*., PageID at 304-06. As a result, the ALJ did not err as a matter of law in rejecting the opinions of Dr. Justiniano-Toro and Dr. Wee and substantial evidence supported the ALJ's reasons for rejecting these treating source opinions.

Plaintiff argues that the ALJ's finding that Plaintiff saw Dr. Justiniano-Toro mostly for medication monitoring services was contradicted by Plaintiff's testimony that she saw him forty-five to sixty minutes each visit. Yet, the ALJ's finding is supported by Dr. Justiniano-Toro's treatment notes, which reflect medication monitoring and little more. *See* Doc. #10, PageID at 350-53.

Plaintiff also challenges the ALJ's statement that Dr. Justiniano-Toro's opinions were based solely on Plaintiff's exaggerated subjective claims. And Plaintiff asserts that the ALJ ignored her somatoform disorder, as diagnosed by Dr. Flexman, and that this disorder may explain her physical symptoms. Yet, the ALJ acknowledged Dr. Flexman's diagnosis of undifferentiated somatoform disorder, but the ALJ also pointed out that Dr. Flexman found Plaintiff's own thinking regarding somatic problems was out of proportion with reality. *See* Doc. #10, PageID at 60, 282. Indeed, Dr. Flexman recorded that the "claimant's response style during the assessment was judged to be suboptimal....

19

[E]ffort during the mental status was poor.... [R]eliability was judged to be fair and suggested moderate malingering." *Id*., PageID at 282. Plaintiff does not connect, or present evidence showing, how her poor effort and malingering during Dr. Flexman's examination is explained by somatization. Dr. Flexman, moreover, made no finding that Plaintiff's moderate malingering was due to her somatoform disorder, and he further determined that Plaintiff had only mild or moderate limitations in all functional areas. *Id*. And, perhaps most significantly, does not point to evidence from any other medical source supporting her assertion that her somatoform disorder explained her exaggerated symptoms as opposed to a lack of credibility on her part. Plaintiff also overlooks the ALJ's finding that her tendency to exaggerate was further shown by claims she made during her testimony when she had not reported the same or similar claims to her doctors. Without medical-source-opinion evidence supporting that this inconsistency was caused by somatization, the ALJ did not err in using this inconsistency as a reason to discount her credibility. *Cf. Spicer v. Apfel*, 15 Fed.App'x. 227, 234 (6th Cir. 2001) ("Faced with Spicer's subjective accounts of his pain on the one hand and the objective medical evidence on the other, we conclude that the ALJ was justified in determining that Spicer's complaints about his pain were exaggerated and not credible.").

Plaintiff does not challenge the multitude other reasons the ALJ provided for giving less weight to the opinions of Drs. Justiniano-Toro. For example, the ALJ found that these opinions were inconsistent with the record as a whole, including treatment records showing virtually no abnormal findings or clinical observations of mental

impairment symptoms.  *See* Doc. #10, PageID at 61–62, 64, 66, 307–45, 350–53, 57–95,

405–27).  The ALJ also stressed evidence showing that Plaintiff was not compliant with

treatment or medication instructions.  *See id., PageID* at 61, 358, 372, 376).  She

specified that Dr. Justiniano-Toro's assignment of a GAF score of 35, suggesting

impairments with reality testing or communication, was inconsistent with Plaintiff's own

reported level of activity.  *See id.*, PageID at 61, 347. Indeed, Plaintiff told Dr. Flexman

that she had no problems with activities of daily living or getting along with others, and

she listed numerous activities including going shopping, eating out

at restaurants, and socializing with friends and family.  *Id.*, PageID at Tr. 275–76,

280–81).

Turning to Drs. Flexman and Hoyle, Plaintiff maintains that the ALJ provided no

rationale as to why she ignored significant aspects of these medical sources' opinion,

including her ability to relate to others.  On the contrary, the ALJ considered Dr.

Flexman's opinion that Plaintiff had moderate limitations interacting with others

*See* Doc. #10, PageID at 60.  The ALJ stressed, however, that Dr. Flexman defined

"moderate limitations" as retaining the ability to function satisfactorily.  *Id.*, PageID at

60, 61, 283.  As a result, Dr. Flexman's opinion on this limitation is consistent with the

ALJ's decision.  The ALJ further explained that Plaintiff had no more than mild

difficulties with social functioning, as evinced by Plaintiff's multiple reports to Dr.

Flexman "that she got along well with others and spent time socializing with family and

friends."  *Id.*, PageID at 61, 276, 280.  The ALJ also noted that "[n]o difficulty relating to

21

others is documented elsewhere in the record with the exception of Dr. Justiniano-Toro's 'assessments' indicating, without explanation, that she retained no useful ability to relate to others." *Id.*, PageID at 61, 347–49.  And the ALJ pointed out that the illegible assessment, which appears to be Dr. Wee's assessment, "indicated a good ability to relate to co-workers and interact with supervisors." *Id.*, PageID at 61, 305. Plaintiff overlooks this substantial evidence in support of the ALJ's assessment of her mental work abilities and limitations.

Plaintiff further argues that the ALJ ignored these doctors' opinions regarding working with fast-paced production quotas.  Yet the ALJ acknowledged the state reviewing doctors' opinion that Plaintiff could not perform work involving fast-paced production quotas but could perform simple or moderately complex work.  The ALJ concluded that this limitation was "accounted for in the limitations to unskilled work activity without assembly-line production quotas."  (Doc. #10, PageID at 64).  The ALJ further determined that Plaintiff was limited to only low stress work.  *Id.*, PageID at 63. And the ALJ considered Dr. Flexman's opinion that Plaintiff had only slight difficulties with simple instructions and work-related decisions, attention, and concentration, and only moderate limitations ("individual is still able to function satisfactorily") with work pressures and responding appropriately to changes in a normal work setting.  *Id.*, PageID at 60, 64, 283.  In light of these aspects of the ALJ's decision, she gave proper consideration to these medical-source opinions.

Plaintiff asserts that the ALJ's limitation ruling out assembly-line production

22

quotas does not account for limitations on all fast-paced production quotas (Pl. Br. 12).

Her argument is unavailing, as she cites no authority or evidence that a limitation to no

assembly-line production quotas does not properly account for a limitation to no fast-

paced production quotas.  The vocational expert, moreover, indicated that exact

production requirements were employer-specific, and she verified that no assembly-line

speed was required for the jobs she identified.  (Doc. #10, PageID at 94–98).  Assuming,

arguendo, that assembly-line production quotas is less restrictive than fast-paced

production quotas, the record does not conclusively establish that an inability to do fast-

paced quota work.  Indeed, the state agency medical sources stated that Plaintiff "would

do best in an environment that does not have fast paced production quotas," not that she

was precluded from performing any fast paced production quota work.  *Id*., PageID at

286.

Accordingly, substantial evidence supports the ALJ's assessments of the medical

source opinions and the ALJ's assessment of Plaintiff's residual functional capacity.

### C.    **Plaintiff's Third Issue**

Plaintiff frames her third issue as follows:

Whether the administrative law judge erred in failing to respond to a request
for a subpoena where the request was made in a timely fashion, the records
requested were reasonably necessary to a full presentation of the case, and
the record does not document any action on the request?

(Doc. #17, PageID at 529).  Plaintiff answers, "Yes," arguing that the ALJ erred by

failing to act on her timely subpoena request to obtain the records of her treating mental

23

health counselor Lorenda Griffin.

It is undisputed that the ALJ took no action on Plaintiff's subpoena request. Plaintiff acknowledges that the Regulations do not specifically state how an ALJ must respond to a subpoena request. She asserts, however, that the Regulations clearly imply action by noting that the Commissioner will pay the cost of issuing a subpoena and that subpoenaed witnesses are paid the same fees and mileage costs as would be paid in federal court.

The Regulations allow a party to request the issuance of a subpoena "[w]hen it is reasonably necessary for the full presentation of a case ...." 20 C.F.R. § 404.950(d)(1). The subpoena request must be submitted in writing and "must ... state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena." 20 C.F.R. § 404.950(d)(2).

Plaintiff's counsel requested a subpoena seeking assistance in obtaining Ms. Griffin's medical records. Counsel explained, "[t]his office believes that the records are required in order to fully develop the record. The Claimant has advised us that this medical provider was a treating care giver and relevant to this claim." (Doc. #10, PageID at 213). This general explanation does not identify any important fact that the subpoena is expected to prove and does not indicate why such facts could not be proven without Ms. Griffin's records. As a result, the subpoena request on its face does not satisfy the requirements of 20 C.F.R. §404.955(d)(2).

Plaintiff contends that the Hearings, Appeals & Litigation Law Manual –

24

specifically, HALLEX 1-2-5-78 – requires an ALJ to decide whether the requested subpoena is "reasonably necessary" and if it is not, the ALJ must provide a written denial of the request along with notification to the record as an exhibit.  The various Circuit Courts of Appeals appear split on the issue of whether the HALLEX creates enforceable rights.  *See Davenport v. Astrue*, 417 Fed.Appx. 544, 547 (7th Cir. 2011)(and cases cited therein).  The United States Courts of Appeals for the Sixth Circuit considers the HALLEX "not binding on this court...," and instead reads HALLEX as "procedural guidance to the staff and adjudicators of the Office of Hearings and Appeals ...."  *Bowie v. Commissioner of Social Sec*., 539 F.3d 395, 399 (6th Cir. 2008); *see Lockwood v. Commissioner of Social Sec.*616 F.3d 1068, 1072 (9th Cir. 2010) ("HALLEX does not impose judicially enforceable duties on either the ALJ or this court.").  Because HALLEX is not binding in the Sixth Circuit and because Plaintiff's request did not comply with §404.950(d)(2), the ALJ's failure to respond to her subpoena request does not constitute an abuse of discretion or reversible error.

Plaintiff emphasizes that the ALJ put Ms. Griffin's records at issue by finding that Plaintiff had only seen Dr. Justiniano-Toro for medication management and that the record as a whole did not support a finding of disability.  These contentions are unavailing due to the conclusory nature of Dr. Justiniano-Toro's opinions and because Dr. Justiniano-Toro did not base his opinions on Ms. Griffin's treatment notes or evaluation of Plaintiff.  *See* Doc. #10, PageID at 347-49, 398-99.  And neither Plaintiff's Statement of Errors nor her Reply provide any particular insight into what Ms. Griffin's records

would likely reveal or what important facts her records would likely establish.

Accordingly, the ALJ did not err in failing to respond to Plaintiff's written subpoena request in the circumstances of this case.

### IT IS THEREFORE RECOMMENDED THAT:

1.     The Commissioner's non-disability decision be affirmed; and

2.     The case be terminated on the docket of this Court.


February 1, 2013

                              s/Sharon L. Ovington
                              Sharon L. Ovington
                    Chief United States Magistrate Judge

26

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen (17) days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See, United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).